UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MERSINO MANAGEMENT COMPANY;
KAREN A. MERSINO, Owner and
Shareholder of Mersino Southwest, LLC and
Mersino Enterprises, Inc.,                                    Case No. 13-cv-11296
and RODNEY A. MERSINO, Owner and
Shareholder of Mersino Management                             Paul D. Borman
Company, Global Pump Company, LLC and                         United States District Judge
Mersino Dewatering, Inc.,

                    Plaintiffs,

v.

KATHLEEN SEBELIUS, Secretary of the
United States Department of Health and
Human Services; UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; SETH D. HARRIS,
Acting Secretary of the United States
Department of Labor; UNITED STATES
DEPARTMENT OF LABOR; JACK LEW,
Secretary of the United States Department of
the Treasury; and UNITED STATES
DEPARTMENT OF THE TREASURY,

                    Defendants.
_____/

## OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

        Before the Court is Plaintiffs Mersino Management Company, Karen Mersino and Rodney

Mersino's ("Mersino") Motion for Temporary Restraining Order and Preliminary Injunction. (ECF

No. 10.) Defendants Kathleen Sebelius, United States Department of Health and Human Services

("HHS"), Seth D. Harris, United States Department of Labor ("DOL"), Jack Lew, and United States

Department of the Treasury ("Treasury") filed a response (ECF No. 16) and Plaintiffs filed a reply

(ECF No. 19).  On May 23, 2013, the American Civil Liberties Union and the American Civil

Liberties Union Fund of Michigan filed a Motion for Leave to File *Amicus Curiae* Brief, which the

Court GRANTS.  (ECF No. 17.)  The Court also GRANTS Plaintiffs' Motion for Leave to File

Response Brief in Opposition to the ACLU's Amicus Brief.  (ECF No. 24.)  The Court held a

hearing on May 29, 2013.  Having heard oral argument, and having considered all of the briefs, for

the reasons that follow, the Court DENIES the motion for preliminary injunctive relief.[1]

## I.      BACKGROUND

Plaintiffs, a for-profit, secular corporation and its two shareholders, filed this action on

March 22, 2013, challenging regulations issued under the Patient Protection and Affordable Care

Act (Pub. L. 111-148, March 23, 2010, 124 Stat. 119) and the Health Care and Education

Reconciliation Act (Pub. L. 111-152, March 30, 2010, 124 Stat. 1029) (collectively the "Affordable

Care Act" or the "ACA").  (Compl. ¶ 2.)  The regulations at issue here, adopted pursuant to the

ACA, require that a group health plan and a health insurance issuer, with certain exceptions for

grandfathered plans not relevant here, offering group or individual health insurance coverage, must

provide coverage to women, without requiring cost-sharing, that includes "preventive care and

---

[1] The Court notes as an initial matter Plaintiffs' lack of urgency in filing this action over a year and a half after the contraceptive coverage regulations were issued and further waiting more than two months after filing the Complaint in this action to seek injunctive relief.  Delays in seeking injunctive relief indicate to the Court that harm is not imminent and that speedy relief is not warranted.  *See, e.g., Huron Mountain Club v. U.S. Army Corps of Eng'rs*, No. 12-cv-197, 2012 WL 3060146, at *4 (W.D. Mich. July 25, 2012) ("[A] long delay in seeking relief indicates that speedy action is not required."); *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (denying preliminary injunction where plaintiff waited forty-four days after regulations were issued to seek injunctive relief).  The failure to move forward with urgency in this action is all the more unexplainable given that Plaintiffs' counsel filed a nearly identical claim in this court over a year ago on behalf of other similarly situated plaintiffs.  *See Legatus v. Sebelius*, No. 12-cv-12061 (E.D. Mich. May 7, 2012).

screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and

Services Administration ["HRSA"] . . ." 42 U.S.C. § 300gg-13(a)(4).  At the time that the ACA was

adopted, there were no existing HRSA guidelines and the HHS commissioned the Institute of

Medicine ("IOM") to provide recommendations for the HRSA guidelines.[2]   The IOM published a

report that recommended that plans be required to cover "[a]ll Food and Drug Administration

approved contraceptive methods, sterilization procedures, and patient education and counseling for

all women with reproductive capacity." *Id*.  FDA approved contraceptive methods include oral

contraceptive pills, diaphragms, injections and implants, emergency contraceptive drugs ("Plan B"

and "ella") and intrauterine devices.[3]   On August 1, 2011, HRSA adopted the IOM

recommendations, *see* 76 Fed. Reg. 46,621, and on February 15, 2012, HHS, DOL and Treasury

published rules finalizing the HRSA guidelines, *see* 77 Fed. Reg. 8725 (Feb. 15, 2012) (Referred

to herein as "the contraceptive coverage regulations" or the "contraceptive coverage mandate".)

The contraceptive coverage regulations contain a religious employer exemption, but that

exemption does not cover secular, for-profit companies whose owners have strong religious

objections to birth control.  Contraceptive coverage by secular, for-profit employers must be

provided pursuant to the regulations beginning with plan years that start after August 1, 2012.[4]

---

[2]  *See* http://www.hrsa.gov/womensguidelines; 76 Fed. Reg. 46,621 (Aug. 3, 2011).

[3]     *See* Birth Control Guide, FDA Office of Women's Health, *available at* http://www.fda.gov/ForConsumers/ByAudience/ForWomen/FreePublications/ucm313215.htm

[4]  The Executive Branch subsequently provided certain religiously-affiliated hospitals and non-profits a moratorium until August 1, 2013 to begin to comply with the rule.  On June 28, 2013, HHS, Labor and Treasury issued final regulations that accommodate these organizations but require the entities that insure them to pick up the tab for contraceptive coverage, concluding that doing so is at the very least "cost-neutral" for the issuers.  77 Fed. Reg. 16501, 16502 (March 21, 2012).  *See* http://www.ofr.gov/OFRUpload/OFRData/2013-15866_PI.pdf

Plaintiffs plan year began on June 1, 2013.

The contraceptive coverage regulations, and in particular those that mandate coverage for abortifacients, conflict with the beliefs held by some religious groups, in particular Catholics, who believe that life begins at conception and, a belief held by a smaller group, that practicing artificial birth control is intrinsically evil and in conflict with God's plan to create human life through the union of a man and a woman. Plaintiffs Karen and Rodney Mersino hold these beliefs and allege that the contraceptive coverage mandate forces them to pay for contraceptives for their employees, in violation of these deeply held religious beliefs.

Plaintiff Mersino Management Company ("Mersino Management") is incorporated under the laws of the State of Michigan and is treated as a subchapter S Corporation for income tax purposes.[5] Mersino Management has 29 employees. (Compl. ¶¶ 22, 24.) Mersino Management has 60,000 authorized shares of common stock, divided into two classes: (1) 12,000 shares of Class A voting common stock; and (2) 48,000 shares of Class B nonvoting common stock. (ECF No. 20, Ex. 3, Mersino Management Articles of Incorporation.) Holders of Class A Voting Common Stock hold the exclusive power to elect the Board of Directors of Mersino Management and to vote on any matter which must be submitted to a vote of the shareholders of a corporation or which is submitted to a vote of the shareholders of the corporation. Together, Plaintiffs Rodney and Karen Mersino own more than 92% of the Voting Common Stock. (ECF No. 20, Ex. 1, May 23, 2012 Affidavit of

---

[5]   The factual allegations are derived from (1) Plaintiffs' Complaint (ECF No. 1); (2) the Declarations and Affidavits filed in support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 10, Exs. 1, 2); (3) the Supplementary Exhibits and from the Supplementary Exhibits in Support of Plaintiffs' Motion for Restraining Order and Preliminary Injunctive Relief filed by Plaintiffs on May 24, 2013 (ECF No. 20, Supplementary Exhibits); (4) the Supplementary Exhibit filed by Plaintiffs on May 30, 2013 (ECF No. 23); and (5) the Exhibit filed by Plaintiffs on June 5, 2013 in Response to the Court's May 29, 2013 Order (ECF No. 26).

4

Amy Glenn ¶ 6.)  Plaintiffs Karen and Rodney Mersino are responsible for setting all policies governing the conduct of Mersino Management.  (ECF No. 10, Ex. 1 ¶ 9, Ex. 2, ¶¶ 7, 8.).  This includes the implementation and maintenance of Mersino Management's self-insured, employee benefits health plan.  (ECF No. 20, Ex. 2, May 23, 2013 Declaration of Rodney A. Mersino, Jr. ¶ 7.)

Plaintiff Rodney A. Mersino owns 526 shares of Class A Voting Common Stock in Mersino Management, which represents 52% of the outstanding Class A Voting Common Stock.  Plaintiff Karen A. Mersino owns 412 shares of Class A Voting Common Stock in Mersino Management, which represents 41% of the outstanding Class A Voting Common Stock in Mersino Management.  (Glen Affidavit ¶¶ 4-5.)  Plaintiffs Rodney and Karen Mersino's son, Rodney A. Mersino, Jr., owns the remaining 8% of the Class A Voting Common Stock in Mersino Management.  Rodney Mersino, Jr. has consented to his parents bringing this action on behalf of Mersino Management.  (ECF No. 20, Ex. 2, Rodney A. Mersino, Jr. Decl. ¶ 8.)  Of the 48,000 authorized shares of Class B Nonvoting Common Stock, Mersino Management has issued only 14,954 shares to Plaintiffs Rodney and Karen Mersino, Rodney Mersino, Jr., and in nominal amounts to Marcus Mersino (Rodney and Karen's son), Christopher Mersino (Rodney and Karen's son) and David Tersigni, (Rodney Mersino's cousin).  (ECF No. 26, Ex. 1, June 5, 2013 Declaration of Rodney A. Mersino ¶¶ 8-14.)

Mersino Management is the management company, and provides health insurance under its self-funded plan, for Mersino Dewatering, Inc. ("Dewatering") (110 employees), Mersino Enterprises, Inc. ("Enterprises"), Global Pump, LLC ("Global Pump") (34 employees) and Mersino Southwest, LLC ("Southwest") (11 employees).  (Compl. ¶¶ 24-29.)  In their decades of leadership of Mersino Management companies, Karen and Rodney Mersino "have remained unwaveringly

dedicated to their values of family, hard work and a faith in God and each other." (Compl. ¶ 39.) Plaintiffs Karen and Rodney Mersino have dedicated their lives and resources to Catholicism and furthering Catholic philanthropic causes and are guided in all that they do by their religious faith. (Compl. ¶¶ 41-43.)

Plaintiffs Karen and Rodney Mersino strive to follow in their business practices the tenets of their Catholic, which prevent them from participating in, paying for, training others to engage in, or otherwise supporting contraception, sterilization, abortion, and abortifacients. (Compl. ¶¶ 53-54, 77-78.) Plaintiffs believe that human life is sacred from the moment of conception and therefore believe that abortion ends a human life and is a grave sin. (Compl. ¶ 71.) Plaintiffs further believe that human sexuality serves two purposes: to unite husband and wife and to generate new life. Thus, they believe that "any action which either before, at the moment of, or after sexual intercourse, is specifically intended to prevent procreation, whether as an end or as a means," including contraception and sterilization, is a grave sin. (Compl. ¶¶ 71-72.) According to their religious beliefs, Plaintiffs cannot provide, fund, or participate in health care insurance which covers artificial contraception, sterilization, abortion, or abortifacients, or related education and counseling, without violating their deeply held religious beliefs. (Compl. ¶ 83.)

Prior to the issuance of the contraceptive coverage regulations, Plaintiffs engineered a self-funded insurance policy with a third party administrator, a non-Mersino entity, Administration Systems Research Corporation, which specifically excluded contraception, sterilization, abortion, and abortifacients, and exempts Plaintiffs from paying, contributing, or supporting contraception, sterilization, abortion and abortifacients for others. Plaintiffs obtained these exclusions due to their deeply held religious beliefs and have never offered insurance which included coverage for

6

contraception, sterilization, abortion, and abortifacients. (Compl. ¶¶ 56-58, 81.)   Administration Systems Research Corporation uses the following medical insurance carriers for Plaintiffs' plan: Private Healthcare Systems (PHCS), Health Alliance Plan (HAP), Physicians Care Health Plans. (Compl. ¶¶ 60, 79.)   Employee Health Insurance Management, a non-Mersino entity, is the Plaintiffs' plan administrator for prescription drug coverage. (Compl. ¶ 61.) Plaintiffs Karen and Rodney Mersino and their Plaintiff Mersino Management companies ensured that their insurance policy contained these exclusions to reflect their deeply held religious beliefs. (Compl. ¶ 62.)

Plaintiffs allege that under the provisions of the ACA, Plaintiff Mersino Management and its related companies Dewatering, Enterprises, Global Pump and Southwest constitute a "single employer" and therefore employee more than 50 full time employees, bringing them within the definition of employers required to provide insurance coverage under the ACA. (Compl. ¶¶ 103-107.) Plaintiffs do not qualify for any non-profit or religious entity exemptions under the ACA and do not qualify as a "grandfathered" health care plan. (Compl. ¶¶ 109-116.)   Plaintiffs became subject to the contraceptive coverage mandate when their plan year began on June 1, 2013. (Compl. ¶¶ 180-181.) Accordingly, Plaintiffs are subject to the contraceptive coverage regulations now and are directly confronted with complying or paying fines/taxes, when they become due, in excess of $6,716,000 per year. (Compl. ¶¶ 120-123.)

Plaintiffs assert that the contraceptive coverage regulations unconstitutionally coerce Plaintiffs to violate their deeply-held religious beliefs under threat of directly violating their consciences, in addition to the threat of monetary fines and penalties. (Compl. ¶ 87.)   Complying with the mandate requires a direct violation of Plaintiffs' religious beliefs because it would require Plaintiffs to pay for and assist others in paying for or obtaining not only contraception but also

abortion because certain drugs and devices, such as the "morning after pill," "Plan B," and "ella," come within the definition of approved contraceptive devices under the ACA despite their known abortifacient mechanisms of action.  (Compl. ¶ 92, 135.)

On March 22, 2013, Plaintiffs filed their Complaint against Defendants Sebelius, HHS, DOL, and Treasury asserting twelve separate claims.  Plaintiffs assert in their motion for preliminary injunctive relief that the contraceptive coverage mandate violates their rights under (1) the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* ("RFRA") (Count VIII) and (2) the First Amendment to the United States Constitution, Free Exercise Clause (Counts I, II, III).  Plaintiffs believe that the mandate forces them to violate a foremost tenet of their Catholic faith which holds that "any action which either before, at the moment of, or after sexual intercourse, is specifically intended to prevent procreation, whether as an end or as a means – including contraception, sterilization, abortion, and abortifacients – is a grave sin."  (Compl. ¶ 3.)

## II.   PRELIMINARY INJUNCTION STANDARDS

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Counsel, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted).  Plaintiff bears the burden of demonstrating entitlement to preliminary injunctive relief and the burden is substantial.  *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).  Such relief will only be granted where "the movant carries his or her burden of proving that the circumstances clearly demand it."   *Overstreet v. Lexington-Fayette Urban County Gov't,* 305 F.3d 566, 573 (6th Cir. 2002).  When considering a motion for injunctive relief, the Court must balance the following factors: (1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent preliminary

injunctive relief, (3) whether granting the preliminary injunctive relief would cause substantial harm to others, and (4) whether the public interest would be served by granting the preliminary injunctive relief. "These factors are not prerequisites, but are factors that are to be balanced against each other." *Id*. "The proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary*, 228 F.3d at 739. "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Medical Examiners*, 225 F.3d 620, 625 (6th Cir. 2000).

## III.   ANALYSIS

The issue before the Court, whether to grant preliminary injunctive relief to a closely-held for-profit secular corporation and its owners who challenge application of the contraceptive coverage regulations to them under RFRA and/or the Free Exercise Clause, has divided courts across the country.[6] Jurists have weighed in on all sides of the debate and there is little doubt that the Supreme Court will ultimately decide the issue.   Until that time, this Court is bound to follow the lead of this Circuit, if one can be discerned, and from there to determine whether Plaintiffs are clearly entitled to the extraordinary relief that they seek in this case.

In *Autocam Corp. v. Sebelius*, No. 12-2673, 2012 U.S. App. LEXIS 26736 (6th Cir. Dec. 28, 2012), the Sixth Circuit denied a motion for an injunction pending appeal of United States District

---

[6] It merits mentioning that other circuits, principally as relevant here the Seventh Circuit, employ a different standard than the Sixth Circuit when analyzing claims for injunctive relief.  The Seventh Circuit has adopted a "sliding scale" standard that only requires "some likelihood of success on the merits," and a full scale balancing of the other factors.  *See, e.g., Korte v. Sebelius*, No. 12-3841, 2012 WL 6757353, at *2 (7th Cir. Dec. 28, 2012).  The Sixth Circuit, unlike the Seventh Circuit, requires a showing of a clear showing of a likelihood of success on the merits and considers that factor to be nearly dispositive.  "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal."  *Gonzales v. Nat'l Bd. of Medical Examiners*, 225 F.3d 620, 625 (6th Cir. 2000).

Judge Robert Jonker's denial of a preliminary injunction in *Autocam Corp. v. Sebelius*, No. 12-cv-1096, 2012 WL 6845677 (W.D. Mich. Dec. 24, 2012).  Plaintiffs in *Autocam*, like the Mersinos, challenged the application of the contraceptive mandate to their closley-held business under RFRA and the Free Exercise Clause.  In denying preliminary injunctive relief, Judge Jonker found that plaintiffs were unlikely to prevail on their First Amendment Free Exercise claim because the contraceptive coverage regulations are a neutral law of general applicability and that they were unlikely to prevail on their RFRA claim because (1) the burden on the corporate plaintiffs, who had the option to restructure from a self-insured plan to an insured plan, was too indirect to be "substantial," and (2) the individual plaintiffs, who were not compelled to do anything under the contraceptive coverage mandate, accepted limits on their own conduct by choosing the corporate form and any burden on them individually was too attenuated to be substantial.  2012 WL 6845677, at *7.

In deciding whether to grant the Autocam plaintiffs an injunction pending appeal, the Sixth Circuit observed the wide divergence in opinion among the district courts on the constitutionality of the application of the contraceptive coverage regulations to closely-held for profit entities and noted that no circuit court had then considered the claims.  The Sixth Circuit found it worth noting, however, that the Supreme Court, in an opinion issued by Justice Sotomayor sitting individually as Circuit Justice for the Tenth Circuit, denied an injunction pending appeal of the Tenth Circuit's denial of an injunction in *Hobby Lobby Stores, Inc. v. Sebelius*, No. 12-6294, 2012 WL 6930302 (10th Cir. Dec. 20, 2012), pending appeal of the district court decision denying preliminary injunctive relief in *Hobby Lobby Stores, Inc. v. Sebelius*, 870 F. Supp. 2d 1278 (W.D. Oklahoma 2012).  *Hobby Lobby Stores, Inc. v. Sebelius*, 133 S.Ct. 641 (2012).

10

In *Hobby Lobby*, Justice Sotomayor, noting the more demanding standard for obtaining an injunction under the All Writs Act, denied injunctive relief finding that "whatever the ultimate merits of the applicants' claims, their entitlement to relief is not 'indisputably clear.'" 133 S.Ct. at 643 (quoting *Lux v. Rodrigues*, 561 U.S. __, __, 131 S.Ct. 5, 6, 177 L.Ed.2d 1045 (2010)).  Making reference to the Supreme Court's decision in *United States v. Lee*, 455 U.S. 252 (1982), Justice Sotomayor observed:

> This Court has not previously addressed similar RFRA or free exercise claims brought by closely held for-profit corporations and their controlling shareholders alleging that the mandatory provision of certain employee benefits substantially burdens their exercise of religion.  *Cf. United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (rejecting free exercise claim brought by individual Amish employer who argued that paying Social Security taxes for his employees interfered with his exercise of religion).

133 S.Ct. at 643.  Justice Sotomayor further noted "that lower courts have diverged on whether to grant temporary injunctive relief to similarly situated plaintiffs raising similar claims . . . and no court has issued a final decision granting permanent relief with respect to such claims."  *Id.*[7]

The Sixth Circuit denied plaintiffs an injunction pending appeal in *Autocam*, conceding that the divergence of opinion among the district court "establishes the possibility of success on the merits," but concluding that plaintiffs had "not demonstrated more than a possibility" and denying the injunction "in light of the lower court's reasoned opinion in this case and the Supreme Court's recent denial of an injunction pending appeal in *Hobby Lobby [Stores, Inc. v. Sebelius*, 133 S.Ct. 641 (2012)]."  2012 U.S. App. LEXIS 26736, at *2.  The Sixth Circuit expressly concluded in *Autocam*

---

[7] Since then, as discussed *infra*, the Tenth Circuit sitting *en banc* recently reversed the district court, finding a likelihood of success on the merits and irreparable harm, and remanding for further consideration of the two remaining preliminary injunction factors.  *Hobby Lobby Stores, Inc. v. Sebelius*, __F.3d__, 2013 WL 3216103 (10th Cir. June 27, 2013).

11

that "it is not clear that the contraceptive requirement violates the plaintiffs' constitutional rights." *Id*. at *4. A "possibility" of success falls short of a "likelihood," and this aspect of *Autocam* cannot be ignored in this Court's analysis of the Plaintiffs' entitlement to preliminary injunctive relief.

Notably, the Sixth Circuit denied Autocam's motion to reconsider its opinion denying an injunction pending appeal. *Autocam Corp. v. Sebelius*, No. 12-2673 (6th Cir. Dec. 31, 2012). The motion to reconsider brought to the panel's attention three supplemental authorities that Autocam argued supported its request for an injunction: (1) the Seventh Circuit's opinion in *Korte v. Sebelius*, 12-3841 (7th Cir. Dec. 28, 2012) (discussed *infra*); (2) a temporary restraining order issued by the district court in *Conestoga Wood Specialties v. Sebelius*, 12-6744 (E.D. Pa. Dec. 28, 2012) (the district court in *Conestoga* subsequently denied preliminary injunctive relief to the plaintiffs; *see* discussion *infra*); and (3) United States District Judge Lawrence Zatkoff's opinion in *Monaghan v. Sebelius*, 12-cv-15488 (E.D. Mich. Dec. 30, 2012) granting preliminary injunctive relief to a closely-held for profit corporation challenging application of the contraceptive coverage regulations. Even in light of these additional authorities, the Sixth Circuit declined to reconsider its original order denying an injunction pending appeal in *Autocam*.

While the legal landscape has changed some since the Sixth Circuit denied injunctive relief pending appeal in *Autocam*, the new contours do not dictate the result in this case. At the time that the Sixth Circuit issued its opinion in *Autocam*, it noted that no circuit had then addressed similar claims. That is no longer the case. In *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health and Human Servs.*, No. 13-1144, 2013 WL 1277419 (3d Cir. Feb. 8, 2013), the Third Circuit denied a stay pending appeal of the district court's denial of injunctive relief to a closely-held for-profit corporation challenging the contraceptive coverage mandate in *Conestoga Wood Specialties*

*Corp. v. Sebelius*, __F. Supp. 2d__, 2013 WL 140110 (E.D. Pa. Jan. 11, 2013). In denying the stay, the Third Circuit concluded that plaintiffs had failed to demonstrate a likelihood of success on the merits and adopted the district court's reasoning and conclusions that: (1) "as a secular, for-profit corporation, Conestoga has no free exercise rights under the First Amendment, and is not a 'person' under the RFRA;" (2) "the ACA regulations are generally applicable because they are not specifically targeted at conduct motivated by religious belief, and are neutral because the purpose of the regulations is to promote public health and gender equality instead of targeting religion" and therefore "need only be 'rationally related to a legitimate government objective' to be upheld;" and (3) plaintiffs' "claims under the RFRA were not likely to succeed because the burden imposed by the regulations does not constitute a 'substantial burden' under the RFRA" in so far as "any burden imposed by the regulations would be too attenuated to be considered substantial and that any burden on the Hahns' ability to exercise their religion would be indirect." 2013 WL 1277419, at *2 (internal citations omitted). Argument on the appeal was heard on May 30, 2013 (Judges Jordan, Vanaskie and Cowen). No opinion has issued.

Unlike the Third Circuit in *Conestoga*, the Seventh Circuit in *Korte v. Sebelius*, No. 12-3841, 2012 WL 6757353 (7th Cir. Dec. 28, 2012) (consolidated with *Grote Indus. LLC v. Sebelius*, 13-077 (7th Cir.) for purposes of appeal) granted plaintiffs an injunction against HHS Secretary Sebelius pending appeal of the district court's denial of their motion for preliminary injunctive relief. The Seventh Circuit concluded that the plaintiffs "established both a reasonable likelihood of success on the merits and irreparable harm, and that the balance of harms tips in their favor." *Id.* at *2. Describing the "religious-liberty violation" at issue as "the *coerced coverage* of contraception, abortifacients, sterilization, and related services, *not*—or perhaps more precisely, *not only*—in the

13

later purchase or use of contraception or related services," the Seventh Circuit concluded that the contraception mandate imposed a substantial burden on the plaintiffs' exercise of their rights, establishing a likelihood of success on their claim under RFRA. *Id*. at *3 (emphasis in original). Also finding irreparable harm and the balance of harms tipping in plaintiffs' favor, the Seventh Circuit granted the motion for injunction pending appeal. Judge Rovner dissented in *Korte*, in a well-reasoned opinion that this Court discusses *infra*. Argument on the appeal was heard on May 22, 2013 (Judges Flaum, Rovner and Sykes). No opinion has issued.[8]

In the first issued opinion reaching the merits of a denial of preliminary injunctive relief in a contraceptive coverage mandate challenge by similarly-situated plaintiffs, the Tenth Circuit sitting *en banc* recently reversed the district court, finding a likelihood of success on the merits and irreparable harm, and remanding for further consideration of the two remaining preliminary

---

[8] Other circuits have addressed the issue and issued orders, but have provided no rationale. The Eighth Circuit, in a one-sentence split panel decision and in a subsequent order interpreting the split panel decision, appears to have concluded that for-profit corporations challenging the contraceptive coverage mandate are deemed to have shown a likelihood of success on the merits, granting an injunction pending appeal in *Annex Medical, Inc. v. Sebelius*, No. 13-1118, 2013 WL 1276025 (8th Cir. Feb. 1, 2013). In *Annex*, the Eighth Circuit interpreted the one-sentence split panel Order in *O'Brien v. U.S. Dep't of HHS,* No. 12-3357 (8th Cir. Nov. 28, 2012), which granted a temporary stay in a similar mandate challenge action, as tantamount to issuing a preliminary injunction. The Eighth Circuit then enjoined enforcement of the mandate against Annex, relief that had been denied by the district court, which had interpreted *O'Brien* differently because the *O'Brien* panel provided no rationale for its decision. The Eighth Circuit denied motions to consolidate *Annex* and *O'Brien*, and dates for oral argument have not been set in either case.

The D.C. Circuit, in *Gilardi v. HHS*, No. 13-5069 (D.C. Cir. March 21 and 29, 2013), first denied an injunction pending appeal of the district court's denial of preliminary injunctive relief in a one-sentence order stating only that appellants had not met the stringent requirements for an injunction pending appeal. Subsequently, after plaintiffs filed an emergency motion for rehearing *en banc* of the denial, the D.C. Circuit granted the motion for an injunction pending appeal, also in a one-sentence order offering no rationale for its decision. Oral argument is set for September 24, 2013 (Brown, Edwards and Randolph).

14

injunction factors. *Hobby Lobby Stores, Inc. v. Sebelius*, __F.3d__, 2013 WL 3216103 (10th Cir. June 27, 2013). Citing the "fundamental and longstanding principle of judicial restraint [that] requires courts [to] avoid reaching constitutional questions in advance of the necessity of deciding them," the majority opinion reviewed only the corporate plaintiffs' (Hobby Lobby and Mardel) claim under RFRA and did not address their claim under the Free Exercise Clause. *Id*. at *65 n.2. Nor did the majority reach the issue of whether the individual owners of the corporate plaintiffs (the Greens) had standing to bring RFRA claims in their own right, because "there [was] no dispute that relief as to Hobby Lobby and Mardel would satisfy the Greens." *Id*. at *65 n.4. The majority did conclude that Hobby Lobby and Mardel had a likelihood of success on their RFRA claim because Hobby Lobby and Mardel are "persons" under RFRA and the contraceptive mandate placed substantial pressure on them to violate their sincere religious beliefs, thus substantially burdening their exercise of religion within the meaning of RFRA. *Id*. at *17.

The Tenth Circuit's opinion in *Hobby Lobby*, fractured as it is with a majority ruling on two preliminary injunction factors, a plurality opinion on other factors, four separate concurrences and two separate dissents, offers cogent proof of the fact that views continue to diverge widely on these issues. The only rulings that garnered unanimous support were (1) that Hobby Lobby and Mardel have Article III standing to sue under RFRA and (2) that the Anti-Injunction Act did not apply to the case. *Id*. at *1. A majority of five judges agreed that the district court erred in concluding that Hobby Lobby and Mardel had not demonstrated a likelihood of success on the merits of their RFRA claim. *Id*. Three judges disagreed with the majority and would have affirmed the district court on this issue. *Id*. The five judge majority that agreed that the district court had erred on likelihood of success on the merits also agreed that Hobby Lobby and Mardel had satisfied the irreparable harm

15

prong of the preliminary injunction standard. *Id.* A four-judge plurality would have resolved the remaining two preliminary injunction factors in favor of Hobby Lobby and Mardel and entered a preliminary injunction, but without a majority on this issue, the case was remanded to the district court for evaluation of the remaining two factors, i.e. the balance of the harms and the public interest. *Id.*

Against this backdrop, this Court analyzes Plaintiffs' claims, recognizing that the opinions issued by the Third, Seventh and Tenth Circuits do not bind this Court and noting that the divergence among the district courts, observed by the Sixth Circuit in *Autocam* and discussed *infra*, persists. In the absence of a resolution of this issue by the Supreme Court, this Court is bound to take direction from the Sixth Circuit which, to date, at least suggests that Plaintiffs' claims fail to demonstrate a likelihood of success on the merits.

### A.      Likelihood of Success on the Merits

This Court interprets the Sixth Circuit's interim opinion in *Autocam*, refusing to reverse the District Court's ruling denying a preliminary injunction, as an indication that the Sixth Circuit would conclude that the Mersino's have failed to establish a clear likelihood of success on the merits of their RFRA and Free Exercise claims that would support the extreme remedy of preliminary injunctive relief. The Sixth Circuit in *Autocam* based its denial of an injunction pending appeal on (1) "the district court's reasoned opinion," and (2) "the Supreme Court's recent denial of an injunction pending appeal in *Hobby Lobby*." Subsequent developments in the jurisprudence surrounding this issue have not undercut either of these rationales. Although the Tenth Circuit reversed the district court in *Hobby Lobby*, this does not undermine the significance of Justice Sotomayor's decision to deny an injunction, admittedly applying a much more stringent standard

16

than is applicable here, but which was based her own analysis of the district court's opinion.  More importantly, however, the logic and reasoning of Judge Jonker's opinion in *Autocam*, and the reasoning of the district courts in *Gilardi v. Sebelius*, __F. Supp. 2d__, 2013 WL 781150 (D.D.C. March 3, 2013), *O'Brien v. HHS*, 894 F. Supp. 2d 1149 (E.D. Mo. 2012), *Briscoe v. Sebelius*, __F. Supp. 2d__, 2013 WL 755413 (D. Colo. Feb. 27, 2013) and *Annex Medical, Inc. v. Sebelius*, No. 12-2804, 2013 WL 101927 (D. Minn. Jan. 8, 2013), and the district court and Third Circuit in *Conestoga*, *supra*, along with Judge Rovner's thoughtful dissent from the Seventh Circuit's opinion in *Korte*, persuade this Court that the Mersino's are unlikely ultimately to succeed on their RFRA and Free Exercise claims.

> 1.     **Plaintiffs' claims under the Free Exercise Clause have little chance of success on the merits.**

This Court agrees with Judge Jonker that: "Plaintiffs' claim based on the Free Exercise Clause of the First Amendment is almost sure to fail [because] [t]he ACA's contraceptive coverage requirement is neutral and generally applicable." *Autocam*, 2012 WL 6845677, at *5.  The right to freely practice one's religion "does not relieve an individual of the obligation to comply" with a "'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Id*. at *5 (quoting *Employment Division Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877 (quoting *United States v. Lee*, 455 U.S. 252, 263 n. 3 (1982)) (Stevens, J. concurring in the judgment).  As Justice Scalia's opinion in *Employment Division* makes clear, the Free Exercise Clause of the First Amendment does not operate to invalidate neutral laws of general applicability.  The contraceptive coverage regulations do not target a particular religious group, nor are they designed to interfere with any particular faith.  Further, they apply equally to all non-exempt, non-grandfathered plans.  *Autocam*, 2012 WL

6845677, at *5.  *See also Conestoga*, 2013 WL 140110, at *9 (finding that the regulations apply to all health plans and are not specifically targeted at conduct motivated by religious belief and that the exemptions indicate an effort by the government to accommodate religious beliefs, not to burden them); *O'Brien,* 894 F. Supp. 2d at 1162 (finding no violation of the free exercise clause because the regulations "apply to all employers not falling under an exemption, regardless of those employers' personal religious inclinations").  Because the regulations are neutral and generally applicable, and are rationally related to the stated government purposes of promoting women's and gender equality, Plaintiffs have failed to demonstrate a likelihood of succeeding on the merits of their claim under the Free Exercise Clause.[9]

---

[9]   The June 28, 2013, final regulations issued by HHS, Labor and Treasury, reiterate the government's purpose in requiring contraceptive coverage without cost sharing:

> The HRSA Guidelines are based on recommendations of the independent Institute of Medicine (IOM), which undertook a review of the scientific and medical evidence on women's preventive services. As documented in the IOM report, "Clinical Preventive Services for Women: Closing the Gaps," women experiencing an unintended pregnancy may not immediately be aware that they are pregnant, and thus delay prenatal care. They also may be less motivated to cease behaviors during pregnancy, such as smoking and consumption of alcohol, that pose pregnancy-related risks. Studies show a greater risk of preterm birth and low birth weight among unintended pregnancies. In addition, contraceptive use helps women improve birth spacing and therefore avoid the increased risk of adverse pregnancy outcomes that comes with pregnancies that are too closely spaced. Short interpregnancy intervals in particular have been associated with low birth weight, prematurity, and small-for-gestational age births. Contraceptives also have medical benefits for women who are contraindicated for pregnancy, and there are demonstrated preventive health benefits from contraceptives relating to conditions other than pregnancy (for example, prevention of certain cancers, menstrual disorders, and acne). In addition, by reducing the number of unintended pregnancies, contraceptives reduce the number of women seeking abortions. It is for a woman and her health care provider in each particular case to weigh any risks against the benefits in deciding whether to use contraceptive services in general or any particular contraceptive service.

18

2. **Plaintiffs' claims under RFRA have little likelihood of success on the merits.**

Congress enacted RFRA in response to the Supreme Court's decision in *Employment Division, Department of Human Services of Oregon v. Smith*, 494 U.S. 872 (1990), which had expressly disavowed application of the substantial burden test to free exercise claims and held that neutral laws of general applicability are subject to rational basis review. 42 U.S.C. § 2000bb(b)(1). (noting that the purpose of RFRA was "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where the free exercise of religion is substantially burdened"). Pursuant to RFRA, the government may not "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the burden, even though substantial, "(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006). Plaintiff bears "the burden of establishing the elements of a prima facie case: that application of the offensive law or policy would substantially burden a sincere, religious exercise." *Conestoga*, 2013 WL 140110, at *9. "Once a prima facie case has been satisfied, the government bears the burden of demonstrating a compelling interest and that the government employed the least restrictive means of carrying out that interest." *Id.* (citing *O Centro*, 546 U.S. 418, 428-29).

Although they concede that they do not qualify for any of the exemptions crafted by Congress in the ACA, and concede further that they are not a "grandfathered" plan under the ACA, Plaintiffs would have the Court conclude that Congress, in enacting RFRA, meant to create an

---

http://www.ofr.gov/OFRUpload/OFRData/2013-15866_PI.pdf  at p. 10 (footnotes omitted).

exemption for secular, for-profit corporations like Mersino Management from federal laws, like the ACA, that otherwise seek to regulate secular for-profit corporate behavior.  Plaintiffs invite the Court to ignore altogether the corporate form of which they have availed themselves, and to ascribe to Mersino Management, the corporate entity, the religious beliefs of its owners/shareholders.  Alternatively, Plaintiffs ask the Court to conclude that Rodney and Karen Mersino, although admittedly not subject to the ACA, are nonetheless substantially burdened in the exercise of their own religious faith by the application of the contraceptive coverage regulations to the company that they own.

The Court concludes that Plaintiffs have not demonstrated that they are likely to succeed on their claims because it appears more likely to the Court that Mersino Managment, as a secular for-profit company, cannot "exercise" religion and cannot act as the alter ego of its owners in challenging the contraceptive mandate under RFRA.  Moreover, even assuming that Rodney and Karen Mersino have standing to challenge the contraceptive coverage mandate, as individuals, the Mersinos have not demonstrated a clear likelihood of success because the regulations do not substantially burden them in the exercise of their individual religious beliefs.

     **a.**     **The threshold issue of standing.**

Although the parties do not address the threshold issue of standing in their briefs, the Sixth Circuit in *Autocam* recently asked the parties in that case for supplemental briefing on the issue of standing.  Thus, the issue seems to merit mention here.  It appears to this Court that Mersino Management, the entity required to comply with the regulations, likely has Article III standing to challenge the contraceptive coverage mandate.  *See Hobby Lobby*, __F.3d__, 2013 WL 3216103, at *6 (concluding that both Hobby Lobby and Mardel have Article III standing because both face

20

"an imminent loss of money, traceable to the contraceptive-coverage requirement [and] [b]oth would receive redress if the court holds the contraceptive-coverage requirement unenforceable as to them"). Mersino Management's claims fail, however, on the merits, because it cannot exercise religion and cannot act as the alter ego of its owners for purposes of asserting a RFRA claim. *See* discussion *infra*.

Some courts addressing challenges to the contraceptive coverage mandate have addressed the standing issue head on, but others have addressed the issue only as a merits-based challenge. Several courts have concluded that a corporation cannot exercise religion and is not a person under RFRA and therefore has no standing to assert a RFRA claim. Others have not addressed the standing issue and simply concluded that a corporation cannot exercise religion and therefore has little likelihood of succeeding on a claim under RFRA. *Compare Gilardi*, 2013 WL 781150, at *8 (holding that "the Freshway Corporations do not exercise religion and therefore cannot succeed on the merits of a claim that the regulation substantially burdens their exercise of religion") *with Briscoe*, 2013 WL 755413, at *5 (holding that a secular, for-profit corporation cannot exercise or practice religion and therefore "lack[s] standing to assert an RFRA claim that a federal regulation burdens their "exercise of religion"). Because, as the Tenth Circuit noted in *Hobby Lobby*, the corporation is required to comply with the contraceptive coverage mandate and would receive redress if granted an injunction, it would appear to this Court that the issue is not one of Mersino Management's Article III standing to challenge the regulation but rather of the corporation's ability to state a claim under RFRA. This Court need not decide this issue because, whether framed as an issue of standing or as merits-based challenge, the Court concludes that Mersino Management is unlikely to succeed on its RFRA claim.

Additionally, it does not appear likely to this Court that Mersino Management would have Article III standing to assert a RFRA claim on behalf of its shareholders under the doctrine of associational standing.  The Court notes, as the government argues in its briefs to the Sixth Circuit, that the doctrine of associational standing has been confined to situations where the members of the association would (1) "otherwise have standing to bring suit on behalf of its members;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  *See, e.g. Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 292 (1985) (holding that non-profit religious organization had standing to assert free exercise claim on behalf of its "associates" who were "drug addicts, derelicts, or criminals"); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 458 (1958) (holding that NAACP, a nonprofit entity, could assert the rights of its members to challenge a compulsion by the State to disclose their identities).

Karen and Rodney Mersino, who are not required individually to comply with the regulations, do not suffer actual injury (they incur no out of pocket costs as individuals) from the contraceptive coverage mandate that would imbue them with Article III standing to challenge the regulations separate and apart from the corporate entity that is required to comply with the regulations.  Thus, the first prong of the associational standing analysis cannot be met here.  Even if they did have standing, as discussed *infra*, their claims are not likely to succeed on the merits.

**b.    Mersino Management is not likely to succeed on its claim under RFRA as a secular, for profit company engaged in purely commercial activity.**

Plaintiff Mersino Management is a secular, for-profit company engaged in the business of water management, designing and installing bypass pumping systems of all types and sizes. *See* www.mersino.com. It is not, and does not claim to be, a religious organization entitled to free exercise protections. *Cf. Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, __U.S.__, 132 S.Ct. 694, 706 (2012) (finding that "the text of the First Amendment . . . gives special solicitude to the rights of religious organizations"); *O'Centro*, 546 U.S. at 420. This Court agrees with the district court in *Conestoga* that "the distinction between religious organizations and secular corporations [is] meaningful, and decline[s] to act as though this difference does not matter." 2013 WL 140110, at *7.

Mersino Management's Articles of Incorporation do not mention a religious purpose, it does not employ persons of only a particular religious faith, it does not purport to conduct religious services as part of its business model. Indeed, Mersino Management recognizes that it does not qualify as an exempt religious organization under the ACA, nor does its core business product, i.e. ground water control systems, reflect in any way a religious purpose. *Cf. Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106 (D.D.C. 2012) (Christian book publishing company, 95% owned by a non-profit religious foundation that receives 96.5% of the company's distributed profits, whose articles of incorporation declare as its purpose "to minister to the spiritual needs of people," and that holds religious services on corporate premises weekly, was indistinguishable from its owners for purposes of asserting free exercise rights). "So far as it appears, the mission of [Mersino Management], like that of any other for-profit, secular business, is to make money in the commercial sphere." *Grote*, 708 F.3d at 857 (Rovner, J. dissenting). *See also Hobby Lobby*, 2013 WL 3216103,

23

at *49 (concluding that Hobby Lobby and Mardel "are for-profit corporations focused on selling merchandise to consumers," that do not enjoy free exercise rights and further noting that "not a single case, until now, has extended RFRA's protections to for-profit corporations") (Briscoe, C. J. dissenting); *Conestoga*, 2013 WL 140110, at *7 (noting that "[g]eneral business corporations . . . do not pray, worship, observe sacraments or take other religiously-motivated actions separate and apart from the intention and direction of their individual actors"); *Gilardi*, 2013 WL 781150, at *7 (finding that "the Freshways Corporations are engaged in purely commercial conduct and do not exercise religion under the RFRA").   As the Third Circuit observed in affirming the district court's refusal to grant an injunction in *Conestoga*:   "Unlike religious *non-profit corporations or organizations*, the religious liberty relevant in the context of for-profit corporations is the liberty of its individuals, not of a *profit-seeking* corporate entity."   *Conestoga*, 2013 WL 1277419, at *5 (Garth, J. concurring) (emphasis in original).

Plaintiffs argue that *Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010) requires this Court to recognize the free exercise rights of a for-profit corporation.   In *Citizens United*, the Supreme Court held that a corporation has free speech rights under the First Amendment to the Constitution.   However, as Judge Goldberg recognized in *Conestoga*: "Although [the free speech and free exercise clauses] reside within the same constitutional amendment, these two provisions have vastly different purposes and precedents . . . ." 2013 WL 140110, at *7.  This Court agrees that history and precedent teach that religious belief and worship, and the protections afforded under the free exercise clause, are more "purely personal" in nature and, under the facts of this case, are "unavailable to a secular, for-profit corporation." *Id*.  Plaintiffs have failed to convince the Court that because the Supreme Court recognized free speech rights of corporations it would

24

likewise recognize free exercise rights in a secular for-profit entity such as Mersino Management.

Mersino Management is in the business of selling water bypass systems for profit. The fact that its owners may hold deep religious beliefs, and that the mission statement of the company includes a statement of fealty to God, does not convert this secular, for profit company into a religious organization capable of exercising religion. *See Gilardi*, 2013 WL 781150, at *6-7 (holding that corporate messages and charitable activities with a religious theme do not establish that the corporations themselves "exercise religion"); *Briscoe*, 2013 WL 755413, at *5 (holding that "[s]ecular, for-profit corporations neither exercise nor practice religion" and concluding that they lacked standing to bring a claim under RFRA). Mersino Management is not a religious organization, does not appear capable of "exercising religion" and is unlikely to succeed on its claim under RFRA.

### c.    Mersino Management is unlikely to succeed on its claim that it can assert a RFRA claim based on the religious beliefs of its shareholder/owners.

Nor can Karen and Rodney Mersino impute their own religious beliefs to their corporation so that the corporation can act as their alter ego and assert those rights on behalf of the Mersinos. "'[I]ncorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, own it, or whom it employs.'" *Conestoga*, 2013 WL 140110, at *8 (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001)). Having assumed the corporate form, and all of the benefits and protections that corporate status assures, the Mersinos cannot simply ignore that form when it suits their needs. "[T]here is a distinction [between a corporation and its owners], and it matters in important respects." *Grote*, 708 F.3d at 857 (Rovner, J. dissenting). As Judge Jonker explained in *Autocam*:

Standing between the [Mersinos] and the decisions some [Mersino] employees make

25

to procure contraceptive services are not only the independent decisions of an employee and the employee's health care provider, but also the corporate form itself. The ability to operate in a corporate form has tax and liability consequences that promote aggregation of capital and productive enterprise. *United States v. Bestfoods*, 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). As corporate owners, the [Mersinos] quite properly enjoy the protections and benefits of the corporate form. But the legal separation of the owners from the corporate enterprise itself also has implications at the enterprise level. A corporate form brings obligations as well as benefits. "When followers of a particular sect enter into commercial activities as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." *[United States v.] Lee*, 455 U.S. [252 (1982)] at 261 . Whatever the ultimate limits of this principle may be, at a minimum it means the corporation is not the alter ego of its owners for purposes of religious belief and exercise.

Any burden on the [Mersinos's] free exercise caused by regulation on the corporation they own is probably too attenuated to be substantial. The mandate does not compel the [Mersinos] as individuals to do anything. They do not have to use or buy contraceptives for themselves or anyone else. It is only the legally separate entities they currently own that have any obligation under the mandate. The law protects that separation between the corporation and its owners for many worthwhile purposes. Neither the law nor equity can ignore the separation when assessing claimed burdens on the individual owners' free exercise of religion caused by requirements imposed on the corporate entities they own.

2012 WL 6845677, at *6. *In accord Conestoga*, 2013 WL 140110, at *8 (agreeing with the

*Autocam* court and noting that "[i]t would be entirely inconsistent to allow the [Mersinos] to enjoy

the benefits of incorporation, while simultaneously piercing the corporate veil for the limited

purpose of challenging these regulations"); *Gilardi*, 2013 WL 781150, at *4-5 (agreeing with the

*Autocam* and *Conestoga* courts that having chosen to conduct their business through the corporate

form, individual owners "cannot simply impute their views onto the corporation such that requiring

the corporation to provide preventive services coverage is the same as requiring the [individual

owners] personally to provide services coverage"); *Briscoe*, 2013 WL 755413, at *6 (citing

*Conestoga* citing *Autocam* and holding that "Briscoe cannot use corporate status to shield himself

26

from liability and at the same [time] use it as a sword to assert an RFRA claim."); *Hobby Lobby*, 2013 WL 3216103, at *50 (noting that "it is simply unreasonable to allow the individual plaintiffs in this case to benefit, in terms of tax and personal liability, from the corporate/individual distinction, but to ignore that distinction when it comes to asserting claims under RFRA") (Briscoe, C.J. dissenting).[10]

Even if in some unique circumstance a for-profit corporation may be so imbued with religious attributes that a different analysis might apply, *see, e.g. Tyndale*, *supra*, those circumstances do not exist in this case. And, in any event, the idea of deciding on a case-by-case basis when a for-profit corporation might be "religious enough" to earn exemption from generally applicable federal laws is a slippery slope no court should attempt go down. As Judge Jonker observed in *Autocam*:

> Finally, the implications of the Plaintiffs' theory are troubling in a way that further undermines their probability of success. Plaintiffs argue, in essence, that the Court cannot look beyond their sincerely held assertion of a religiously based objection to the mandate to assess whether it actually functions as a substantial burden on the exercise of religion. But if accepted, this theory would mean that every government regulation could be subject to the compelling interest and narrowest possible means test of RFRA based simply on an asserted religious basis for objection. This would subject virtually every government action to a potential private veto based on a person's ability to articulate a sincerely held objection tied in some rational way to a particular religious belief. Such a rule would paralyze the normal process of governing, and threaten to replace a generally uniform pattern of economic and social regulation with a patchwork array of theocratic fiefdoms.

---

[10] This Court disagrees with the Ninth Circuit's decisions in *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 619-620 (9th Cir. 1988) and *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 112–21 (9th Cir. 2009), which held that for-profit corporations have standing to assert the rights of their shareholders. Such a conclusion, as discussed *supra*, at least on the facts of this case, is at odds with basic tenets of corporate law. *See Conestoga*, 2013 WL 140110, at *7-8 (rejecting the reasoning of *Townley* and *Stormans* as out of line with incorporation's basic purpose and concluding that Conestoga did not possess free exercise rights under the First Amendment).

2012 WL 6845677, at * 7.  Chief Judge Briscoe made a similar observation in her well-reasoned

dissent in *Hobby Lobby*:

> [I]f all it takes for a corporation to be categorized as a "faith based business" for
> purposes of RFRA is a combination of a general religious statement in the
> corporation's statement of purpose and more specific religious beliefs on the part of
> the corporation's founders or owners, the majority's holding will have, intentionally
> or unwittingly, opened the floodgates to RFRA litigation challenging any number of
> federal statutes that govern corporate affairs (e.g., Title VII of the Civil Rights Act
> of 1964, the Fair Labor Standards Act). . . .  In short, the majority's holding threatens
> to entangle the government in the impermissible business of determining whether
> for-profit corporations are sufficiently "religious" to be entitled to protection under
> RFRA from a vast array of federal legislation.

2013 WL 3216103, at *51 (internal citations omitted) (Briscoe, C. J. dissenting).

    The ramifications of concluding that Plaintiffs may assert claims under RFRA through their

corporation go far beyond the contraceptive coverage mandate at issue here.  As Judge Rovner

observed in her dissenting opinion in *Grote*, contraceptive coverage is the current "hot button" issue,

but similar controversial issues loom on the horizon:

> But contraceptive care is by no means the sole form of health care that implicates
> religious concerns. To cite a few examples: artificial insemination and other
> reproductive technologies; genetic screening, counseling, and gene therapy;
> preventative and remedial treatment for sexually-transmitted diseases; sex
> reassignment; vaccination; organ transplantation from deceased donors; blood
> transfusions; stem cell therapies; end-of-life care, including the initiation and
> termination of life support; and, for some religions, virtually all conventional medical
> treatments. If the RFRA entitles the controlling shareholder of a corporation to
> exclude coverage for contraceptive care from the company's health plan on the basis
> of his religious beliefs, then, as I noted in *Korte v. Sebelius*, 2012 WL 6757353, at
> *5, and as Judge Barker noted below, *see Grote Indus*., —— F.Supp.2d at ——, 2012
> WL 6725905, at *6, I can see no reason why coverage for any number of medical
> services could not also be excluded from a workplace health plan on the same basis.

708 F.3d at 866 (Rovner, J. dissenting).  This Court concurs with this compelling analysis.

    Mersino Management chose the corporate form.  It is not an individual or a non-profit

religious organization entitled to protection in the free exercise of its religious beliefs.  As the

Supreme Court recognized in *Lee*: "When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." 455 U.S. at 261. Plaintiffs Karen and Rodney Mersino (1) chose the corporate form, and (2) cannot ignore the corporate form and impute their religious beliefs onto their corporation for purposes of asserting a claim under RFRA.[11] Mersino Management thus has little likelihood of succeeding on a claim based upon the religious beliefs of its owners.

> **d.   Even assuming that Rodney and Karen Mersino have standing as individuals to challenge the regulations under RFRA, they are unlikely to succeed on their claim that the contraceptive coverage mandate substantially burdens their exercise of religion.**

Karen and Rodney Mersino are not required to comply with the contraceptive coverage mandate and therefore lack standing to assert a claim under RFRA challenging those regulations. Even assuming *arguendo* that the Mersinos did have standing as individuals to challenge the regulations as a substantial burden on their exercise of their personal faith, any burden imposed on them likely would be too attenuated given the indirect nature of their involvement and given the

---

[11]   Nor is the Court inclined to see a distinction in this case based upon the fact that Mersino Management has decided to self-fund their employees' insurance needs; the obligation to cover contraceptives still "falls not on the [Mersinos] personally but on [Mersino Management's] health care plan." *Grote*, 708 F.3d at 863 (Rovner, J. dissenting) (noting further that "one ought to acknowledge that the self-funding arrangement is one of the employer's making - and possibly one having little or nothing to do with the employer's religious beliefs - rather than the government's."). *See also Autocam*, 2012 WL 6845677, at *6 n.1 ("If the Plaintiffs are more comfortable religiously and morally with more layers of insulation between the wages and benefits earned, on the one hand, and an employee's decision to acquire contraceptives with them, Plaintiffs have the option of restructuring from a self-insured plan to an insured plan."). In this case, several layers insulate the Mersinos, who employ independent third party administrators for both medical and prescription drug coverage, and could, if they chose, create a cafeteria health care spending account for employees to further insulate themselves from individual employees' decisions to utilize birth control.

protection afforded to them by the corporate form. *See, e.g. O'Brien*, 894 F. Supp. 2d at 1159 ("The Court rejects the proposition that requiring indirect financial support of a practice, from which plaintiff himself abstains according to his religious principles, constitutes a substantial burden on plaintiff's religious exercise."); *Annex*, 2013 WL 101927, at *4, 9 (rejecting the proposition "that requiring indirect financial support of a practice from which plaintiff himself abstains according to his religious principles, constitutes a substantial burden on plaintiff's religious exercise" and concluding that RFRA "was not designed to protect against the slight burden on religious exercise that arises when one's money circuitously flows to support the conduct of other free-exercise-wielding individuals who hold religious beliefs that differ from one's own") (internal quotation marks and citation omitted); *Grote*, 708 F.3d at 858-59 (noting that "[a]ny burden imposed on the Grotes individually by the contraception mandate is, as Judge Barker reasoned, likely too remote and attenuated to be considered substantial") (Rovner, J. dissenting) (internal quotation marks and citation omitted); *Conestoga*, 2013 WL 140110, at *14 (finding any burden imposed on the Hahns individually to be "too attenuated to be considered substantial" where a "series of events must first occur before the actual use of an abortifacient would come into play" and finding that the corporate form "further separates the Hahns from the requirements of the ACA"); *Autocam*, 2012 WL 6845677, at *7 (finding that the mandate "does not compel the Kennedys as individuals to do anything" and observing that given the separation between a corporation and its owners/shareholders "[a]ny burden on the [individual owners] free exercise caused by regulation on the corporation they own is probably too attenuated to be substantial"); *Conestoga*, 2013 WL 140110, at *14 (noting that the corporate form further separates the individual owners and that whatever burden the owners may feel from being involved with a secular for-profit entity that provides health insurance that might

be used to pay for contraceptives is "simply too indirect to be considered substantial under the RFRA").

Plaintiffs maintain that their sincerely held religious beliefs preclude them from indirectly providing the means for their employees to make the independent decision to purchase contraceptives, i.e they assert that being forced to provide coverage places a substantial burden on their religious exercise, regardless of whether an employee actually chooses to obtain contraceptives under the plan. Plaintiffs argue that courts that have concluded that any burden imposed on them by the regulations is too attenuated to be substantial are in fact questioning this fundamental sincerely held belief, which all parties agree courts are precluded from doing under a RFRA analysis. Plaintiffs claim this gives them a "silver bullet," that by alleging sincerity, the discussion is over. Not so! As many courts have noted, permitting Plaintiffs to determine what constitutes "substantial" and then insulating this proposition from challenge, impermissibly converts the "substantial burden" requirement to an "any burden" showing. *Gilardi*, 2013 WL 781150, at *8 (declining to "follow several recent cases suggesting that a plaintiff can meet his burden of establishing that a law creates a 'substantial burden' upon his exercise of religion simply because he claims it to be so" because to do would impermissibly convert the "substantial burden" of RFRA to an "any burden" standard); *Conestoga*, 2013 WL 140110, at *12 (rejecting the notion that "a plaintiff shows a burden to be substantial simply by claiming that it is" as presenting "a very slippery slope upon which we are not prepared to descend").

This Court agrees with the reasoning of these courts and concludes that Karen and Rodney Mersino, if they had standing to challenge the regulations under RFRA, would be unlikely to succeed on a claim under RFRA based upon any burden imposed by the contraceptive coverage

31

mandate on their exercise of their faith as individuals.  This Court agrees that it is likely that the burden Plaintiffs define is too attenuated to be substantial, and that defining a burden as substantial merely because Plaintiffs claim it is substantial has great potential for abuse.  The Court finds it significant, if not dispositive, that Mersino Management's decision to operate in the corporate form further insulates the Mersinos from any burden that the regulations might impose on the corporation. The Court concludes that the Mersinos as individuals have little likelihood of succeeding on their RFRA claim.            **B.       Irreparable Harm**

Plaintiffs argue, and courts have agreed, that because Defendants have already granted significant exemptions to the mandate, and because they have consented to the imposition of injunctive relief in several cases involving similarly situated corporate and individual entities, they cannot claim to face irreparable harm if an injunction is entered in this case.  *See Geneva College v. Sebelius*, No. 12-00207, 2013 WL 3071481, at *11 (W.D. Pa. June 18, 2013) ("Defendants cannot claim irreparable harm in this case while acquiescing to preliminary injunctive relief in other cases.")  However, where the government has conceded to injunctive relief, it appears that it has generally done so in jurisdictions where the legal landscape has been set against them, and continuing to litigate the claims in those jurisdictions would be a waste of both judicial and client resources.  The Sixth Circuit is not such a jurisdiction.

Further, as the Court noted *supra*, Plaintiffs' claim of irreparable harm is undermined by their delay in filing this action and this motion.

**C.       Harm to Others and the Public Interest**

The Court concludes that, given its analysis on the likelihood of success on the merits, which weighs decidedly against granting preliminary injunctive relief, and given its observations

on the issue of irreparable harm, it need not address these two remaining factors. "Although no one

factor is controlling, a finding that there is simply no likelihood of success on the merits is usually

fatal." *Gonzales*, 225 F.3d at 625. *See Eden Foods, Inc. v. Sebelius*, No. 13-11229, (E.D. Mich.

May 21, 2013) (Hood, J.) (denying injunction to closely held secular for profit corporation and its

owners challenging the contraceptive coverage mandate, finding that plaintiffs had not demonstrated

a likelihood of success on the merits and concluding that the remaining preliminary injunction

factors need not be addressed).

## IV.   CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion for preliminary injunctive

relief.

IT IS SO ORDERED.


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  July 11, 2013


## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party
of record herein by electronic means or first class U.S. mail on July 11, 2013.


s/Deborah Tofil
Case Manager